COMMONWEALTH *vs.* ANTONIO GENDRAW.

No. 00-P-1275.

Suffolk. February 6, 2002. - September 3, 2002.

Present: BECK, SMITH, & KANTROWITZ, JJ.

*Homicide. Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Motion to suppress, Admissions and confessions, Plea, Required finding, Instructions to jury. *Evidence,* Admissions and confessions, Joint venturer. *Malice.*

A criminal defendant was not in custody when he gave a statement to police detectives, and therefore Miranda warnings were not required prior to or during the statement, where the interrogation took place in the defendant's kitchen, a setting that was not inherently coercive; where, although the detectives may have believed that the defendant was a suspect, they did not convey any such belief to the defendant; where the interview was neither aggressive nor accusatory; and where the defendant escorted the detectives to the door at the end of the interview, and was not arrested until one week after the interview. [682-684]

The defendant in a murder case did not demonstrate an abuse of discretion by either a motion judge or the trial judge in refusing to accept the defendant's plea of guilty to manslaughter, pursuant to *North Carolina* v. *Alford,* 400 U.S. 25 (1970). [684]

The judge at a murder trial did not err in denying the defendant's motion for a required finding of not guilty, on the ground that the Commonwealth had not presented sufficient evidence of his participation in the murder as a joint venturer, where the Commonwealth introduced sufficient evidence to warrant the jury in returning their verdict. [685-686]

At a murder trial, the judge's supplemental instruction to the jury on joint venture misstated the definition of knowledge under joint venture, but such error did not create a substantial risk of a miscarriage of justice, where the judge gave the correct instruction with respect to knowledge in her initial charge, and after initially misstating the Commonwealth's burden in the supplemental instruction, the judge stated the correct standard at least six times in the supplemental instruction [686-688]; moreover, the judge's supplemental instruction with respect to malice was not error, where, in instructing the jury that they could rely on all of the facts and circumstances developed at trial, the judge did not specifically indicate that the defendant's conduct after the murder should be included in their consideration, and made it clear that the jury should rely on her earlier instruction on specific intent which informed the jury that consciousness of guilt evidence could not be used on the issue of malice [688-689].

The judge at a murder trial did not err in declining to instruct the jury, with regard to the elements of murder in the second degree, that they had to be unanimous as to how malice was proved. [689-690]

INDICTMENT found and returned in the Superior Court Department on December 16, 1997.

A pretrial motion to suppress evidence was heard by *David M. Roseman*, J., and the case was tried before *Christine M. McEvoy*, J.

*Richard J. Shea* for the defendant.

*Susanne Levsen Reardon*, Assistant District Attorney, for the Commonwealth.

SMITH, J. On December 16, 1997, a Suffolk County grand jury returned an indictment against the defendant, Antonio Gendraw, for murder in the first degree. On May 17, 1999, the defendant was convicted by a jury of murder in the second degree. On appeal, the defendant claims the following errors: (1) the denial of his motion to suppress his statements; (2) the refusal of two judges to accept his *Alford* plea (*North Carolina* v. *Alford*, 400 U.S. 25 [1970]); (3) the denial of his motion for a required finding of not guilty; and (4) improper instructions to the jury on joint venture and malice. He also claims that the cumulative errors in the course of the trial created a substantial risk of a miscarriage of justice. Finally, the defendant contends that his trial counsel provided ineffective assistance of counsel.

*Facts.* The facts that the jury could have found are not significantly different from the findings of fact made by the motion judge in regard to the defendant's suppression motion and are as follows.

In November of 1997, the victim, Barry Handy, was living with his girlfriend, Christina Davis, and their two sons at 18 Warner Street in the Dorchester section of Boston. At that time, Handy was selling cocaine at night and sleeping during the day. On November 10, 1997, at approximately 2:00 A.M., the telephone rang and Davis answered. The caller asked for Handy. Davis did not recognize the man's voice and gave the phone to Handy. After a conversation, Handy got dressed and left the apartment. Later that night, Handy was fatally shot several times outside his Dodge Stratus automobile on Bird Street in

Dorchester. He had six gunshot wounds in his chest, back, leg, and hand.

Several Boston police officers were dispatched to the scene to perform various parts of the investigation. The first officers arriving at the scene noticed that the driver's side window of the Dodge Stratus was broken, with glass on the inside of the car. A pair of jeans hung out of the open trunk, and a baby stroller was located about three feet behind the car near a bag of marijuana. Drugs were found in the pocket of the jeans.[1]

One of the officers walked up Bird Street to survey the area. A neighbor alerted him to a hubcap leaning against the sidewalk, about twenty yards from the crime scene. The officer then drove around the area in an attempt to find the vehicle to which the hubcap belonged. He found a brown Toyota Camry on Baker Street which was missing a similar hubcap. Its front tire was flat. The police officers later determined that the vehicle was registered to an Alecia Facey of 19 Winter Street in Dorchester.

The officers at the scene continued their investigation by interviewing residents of the Bird Street area. Some residents told the officers that at approximately 3:30 A.M. they had been awakened by the sound of gunfire. Three witnesses said that they saw two people get out of the back seat of a white car and run down Bird Street. Another man, who had been on the driver's side of the vehicle, went around to the passenger side, opened the door, and pulled a man out onto the ground. He then went to the back of the vehicle, opened the trunk, and began throwing things out of the trunk. The man then went back to the person lying on the ground and shot him once. The shooter then returned to the trunk, looked into it, and began throwing more items out of it. One of the witnesses saw the shooter then shoot the victim again, while standing over him. A few seconds later, a brown Toyota, its headlights out, with a flat tire on the right side, came down the street the wrong way. Someone in the car said to the shooter, "Come on!" The shooter got into the front passenger side of the Toyota and the car drove away from the scene. None of the witnesses could identify any of the people involved in the shooting or in the escape from the scene.

---

[1] The victim's girlfriend testified that the victim sometimes stored a quantity of cocaine in a baby stroller in the trunk of his car.

Boston police Detectives Robert Merner and Thomas O'Leary arrived at the scene at approximately 4:50 A.M. O'Leary learned that a brown Toyota Camry found about one mile from the murder scene may have been involved in the murder. Sometime after 7:00 A.M., the detectives, while observing that vehicle, noticed a male and a female looking at the vehicle before walking away toward Quincy Street. Those individuals were the defendant and Alecia Facey, the owner of the vehicle. Merner followed the two individuals in his vehicle and saw them walk into 19 Winter Street. Merner then rejoined O'Leary, and the two detectives went to Facey's apartment to interview her about her vehicle.

When the detectives knocked, Facey answered the door and allowed them into the apartment. They first looked around the apartment. Approaching the bedroom, the detectives saw the defendant, known to Merner as Antonio Gendraw, getting out of bed, causing a beeper to fall to the floor. O'Leary asked the defendant if he had seen them on Quincy Street minutes earlier; the defendant admitted that he had been there, volunteering that he and Facey were coming from "the store."

The three went into the parlor, where O'Leary asked if he could take their statements at homicide headquarters. Facey agreed. The defendant, after telephoning his mother, declined, telling the detectives that first he would need to speak to his lawyer. The defendant offered, however, to be interviewed in the apartment without contacting counsel. O'Leary demurred, telling the defendant that he would speak with him at another time.

O'Leary, Merner, and Facey then proceeded to homicide headquarters, where Facey was questioned by the detectives. She initially told them that on November 9 (the day before the murder) she had parked her car on Fifield Street. It was not missing a hubcap. On November 10, she realized that her keys were gone. After further questioning by the police, she admitted that she had lied to the police about her missing car keys. She then told them that when the defendant came home in the morning of November 10, he told her that the Toyota had a flat tire and that if the police came to question her she was to tell them that she could not find her keys and to report that her car had

been stolen. The defendant also told her not to say anything otherwise to the police.

On November 13, 1997, at about 8:00 P.M., Detectives O'Leary and Merner returned to 19 Winter Street to interview Facey. The defendant answered the door and, responding to O'Leary's request that he be interviewed, invited the detectives in, took them to the kitchen, and closed the door. The three sat at the kitchen table. O'Leary asked the defendant what had happened on the night of November 10, 1997, and whether he wanted "to get anything off his chest."[2] The defendant responded that he had not seen the assailants because they had had masks covering their faces. O'Leary was surprised at the defendant's response and asked the defendant to explain. The defendant said that he had gone to meet the victim on Bird Street after the victim had "beeped" him. He was going to sell the victim sixty-two grams of cocaine. The defendant had parked the Toyota on Bird Street and was walking towards the victim's vehicle when two masked men jumped out and started firing guns. The defendant stated that he then had run for his life. Prodded by O'Leary as to why the victim was murdered, the defendant said that the victim had fought with several men a few days before the murder, men who had thrown bottles at the victim and given him a black eye.

The defendant told the detectives that he then returned to his car and, with the lights out, made a U-turn and struck the curb, resulting in a flat tire. He then drove down Bird Street and saw the victim lying in the street. He drove around the corner, parked the vehicle, and ran to his mother's house. He stayed there for a period of time and then walked to 19 Winter Street, arriving around 7:00 A.M.

The interview with the defendant lasted approximately forty-five minutes, during which the defendant sweated profusely. Twice the defendant declined to be tape-recorded. At one point, the defendant got up to get a glass of water, stating that he was in "the hot seat." The interview concluded when the defendant escorted the detectives to the door. Merner and O'Leary had not

---

[2] The defendant's subsequent statements were the subject of a suppression motion. We will discuss the denial of that motion later in this opinion.

given the defendant Miranda warnings prior to or during the interview.

Between November 14, 1997, and November 18, 1997, the police executed a search of the Toyota pursuant to a warrant and recovered a ski mask as well as a black stocking that was in a black jacket found in the back seat. The right front tire was flat and was missing a hubcap. The ignition was intact, and there were no signs of forced entry. On November 19, 1997, the defendant was arrested and charged with Handy's murder.

1. *Denial of the defendant's motion to suppress.* The defendant claims that the motion judge erred when he ruled that Miranda warnings were not required prior to or during the defendant's statement to Detectives Merner and O'Leary on November 13, 1997, because the defendant was not in custody at that time. We do not disturb the motion judge's findings of fact unless they are clearly erroneous, but his rulings of law are subject to independent appellate review. *Commonwealth* v. *Welch,* 420 Mass. 646, 651 (1995). *Commonwealth* v. *James,* 427 Mass. 312, 314 (1998). We agree with the motion judge that the defendant was not in custody at the time of his interrogation and that, therefore, Miranda warnings were not required.

Custodial interrogation requiring Miranda warnings has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). *Commonwealth* v. *Coleman,* 49 Mass. App. Ct. 150, 153 (2000). "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody. . . . Thus, if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required." *Commonwealth* v. *Damiano,* 422 Mass. 10, 13 (1996).

Determining when custodial interrogation has occurred depends on several factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect;

(3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001).

Here, the police talked to the defendant in his kitchen, after he had invited them into his home. That setting was not inherently coercive. *Commonwealth* v. *Conkey*, 430 Mass. 139, 144 (1999) (interview of defendant at his home and with his acquiescence not custodial).

In regard to the second factor, although the officers may have believed that the defendant was a suspect, the motion judge credited O'Leary's testimony that the detectives did not convey any such belief to the defendant. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 171, cert. denied, 525 U.S. 1007 (1998) (warnings not required simply because person questioned is one whom police suspect).

The motion judge found that the interview was neither aggressive nor accusatory. See *Commonwealth* v. *Osachuk*, 418 Mass. 229, 234-235 (1994). The judge credited O'Leary's testimony that, even when the defendant admitted to being at the scene, the tone of the interview never changed. See *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995) (Miranda warnings not required because interview not conducted in aggressive manner); *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 297 (1992) (question and answer format, with narrative from defendant, deemed nonthreatening).

Finally, the defendant escorted the detectives to the door at the end of the interview. The defendant was not arrested until one week after the interview. See *Commonwealth* v. *Harris*, 387 Mass. 758, 765 (1982) (defendant arrested one month after interview); *Breese* v. *Commonwealth*, 415 Mass. 249, 255 (1993) (defendant arrested two weeks after questioning).

Applying the above factors to the questioning of the defendant by the detectives, we conclude that the defendant was not

subject to any custodial interrogation, and we, therefore, affirm the denial of the suppression motion.

2. *Refusal to accept the defendant's Alford plea.* The defendant claims that the trial judge, as well as an earlier judge, abused their discretion when they each refused to accept his guilty plea to manslaughter, pursuant to *North Carolina* v. *Alford,* 400 U.S. 25 (1970). The defendant claims that the first judge's exclusion of all *Alford* pleas denied him individualized consideration of his plea.

Under *Alford,* a "defendant who professes innocence may nevertheless plead guilty and 'voluntarily, knowingly and understandingly consent to the imposition of a prison sentence,' if the State can demonstrate a 'strong factual basis' for the plea." *Commonwealth* v. *DelVerde,* 398 Mass. 288, 297 (1986), quoting from *North Carolina* v. *Alford, supra* at 37-38. Despite the fact that there is a constitutional right simultaneously to plead guilty and to protest innocence, "there is no constitutional right to have the plea accepted." *Commonwealth* v. *Lawrence,* 404 Mass. 378, 389 (1989), quoting from *Commonwealth* v. *Dilone,* 385 Mass. 281, 285 (1982). A judge is afforded wide discretion in determining whether to accept a guilty plea. *Commonwealth* v. *Watson,* 393 Mass. 297, 301 (1984). See Mass.R. Crim.P. 12(a)(2), 378 Mass. 866 (1979).

In this case, the first judge refused the defendant's *Alford* plea to manslaughter with a joint sentencing recommendation, stating that she only accepted *Alford* pleas when a defendant claims a lack of memory of the events in question. The trial judge, who also refused the defendant's *Alford* plea, stated that she considered other factors than the earlier judge in deciding whether to accept the plea, but would only accept a traditional guilty plea from this defendant.

The defendant has not shown an abuse of discretion by either judge. "We say this even if, on the record, the judge could have been satisfied that there was a factual basis for the guilty plea. The fact that [a] judge ha[s] a practice of not accepting an *Alford* plea . . . , while other judges might have accepted such a plea, provides the defendant with no appellate issue." *Commonwealth* v. *Dilone, supra* at 285. See *Commonwealth* v. *Lawrence, supra.*

3. *Denial of the defendant's motion for a required finding of not guilty.* The defendant claims that the judge erred when he denied his motion for a required finding of not guilty, because the Commonwealth did not present sufficient evidence of his participation in the murder as a joint venturer.

We view the evidence under the familiar standard set out in *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). "To prove joint venture, the Commonwealth must demonstrate beyond a reasonable doubt that the defendant was not only present at the commission of the crime, but that he aided, commanded, counselled, or encouraged the commission of the offense while sharing the mental state required for its commission." *Commonwealth* v. *Cintron,* 435 Mass. 509, 515 (2001).

It was the Commonwealth's theory at trial that the defendant was one of three men who lured the victim to a side street in Dorchester in order to rob him. The Commonwealth relied on circumstantial evidence. "A conviction may be properly based entirely on circumstantial evidence so long as that evidence establishes the defendant's guilt beyond a reasonable doubt." *Commonwealth* v. *Martino,* 412 Mass. 267, 272 (1992). Where the evidence is largely circumstantial, "it is not essential that the inferences drawn should be [the] only necessary inferences. . . . It is enough that [the inferences] be reasonable and possible." *Ibid.,* quoting from *Commonwealth* v. *Merrick,* 255 Mass. 510, 514 (1926).

The defendant conceded that he was present at the scene of the murder. The Commonwealth presented evidence that the defendant called the victim, a drug dealer, and arranged a drug deal with him. The defendant drove the Toyota to a location near the meeting place. After the victim was shot, the Toyota arrived at the scene, someone in the car said to the shooter, "Come on!" and the shooter got into the vehicle, and it left the scene.

The evidence was overwhelming that the Toyota that was at the scene was the same vehicle that the defendant had been driving earlier that evening. This evidence could be seen as "indicative of prearrangement between the defendant and [the shooter], and tend[s] to prove advance knowledge on the

defendant's part." *Commonwealth* v. *Kilburn*, 426 Mass. 31, 36 (1997), quoting from *Commonwealth* v. *Stewart*, 411 Mass. 345, 352-353 (1991). The evidence revealed more than a "mere association with the perpetrators of a crime, before and after its commission." *Commonwealth* v. *Ahart*, 37 Mass. App. Ct. 565, 571 (1994), quoting from *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 241 (1982).

The evidence also demonstrated that the defendant shared the shooter's intent to kill. Here, the victim was shot six times from close range, which indicates an execution type of killing. The shooter ran straight to the defendant's car after the shooting and the car drove off. See *Commonwealth* v. *Stewart*, 411 Mass. at 351-352.

The defendant's conduct after the murder showed consciousness of guilt on his part. His claim that two masked men had committed the murder was called into question by the testimony of several eyewitnesses to the shooting. His flight from the scene and his request to Facey to lie to the police that her car had been stolen also demonstrated his consciousness of guilt.

Altogether, the Commonwealth introduced a "mosaic of evidence" that "warranted the jury in returning their verdict." *Commonwealth* v. *Thompson*, 431 Mass. 108, 114, cert. denied, 531 U.S. 864 (2000), quoting from *Commonwealth* v. *Salim*, 399 Mass. 227, 233 (1987). "The evidence was substantial enough so that the question of guilt was not left to conjecture or surmise." *Commonwealth* v. *Cordle*, 404 Mass. 733, 742 (1989), quoting from *Commonwealth* v. *Anderson*, 396 Mass. 306, 313 (1985).

Accordingly, the trial judge did not commit error in denying the defendant's motion for a required finding of not guilty.

4. *Jury instructions on joint venture.* The defendant claims two errors in the trial judge's instructions to the jury on joint venture. First, he claims that the judge's supplemental instruction on joint venture, as to the element of knowledge, erroneously lowered the Commonwealth's burden of proof so as to create a substantial risk of a miscarriage of justice. Second, he claims that the judge's supplemental instruction on joint venture also improperly invited the jury to consider conduct of the defendant after the killing in finding malice.

Where, as here, the defendant failed to object seasonably, we review the error, if any, to determine whether it created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999). *Commonwealth* v. *Matthews*, 49 Mass. App. Ct. 365, 365-366 (2000). In doing so, we read the judge's charge as a whole to determine whether there is a "substantial danger that the jury were misled by the erroneous instruction, and [whether] the instruction may have materially influenced their appraisal of the [evidence]." *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). The court is not required to consider whether isolated portions of the charge were adequate. *Commonwealth* v. *Galford*, 413 Mass. 364, 372 (1992), cert. denied, 506 U.S. 1065 (1993). *Commonwealth* v. *Talbot*, 35 Mass. App. Ct. 766, 776 (1994).

a. *Joint venture instruction with respect to knowledge.* In response to the jury's request to be reinstructed on joint venture, particularly the second element of knowledge, the judge gave, in part, the following instruction:

> "With respect to the second element, the Commonwealth must prove beyond a reasonable doubt that the defendant had knowledge that another person or persons intended to commit the crime. In other words, the government must prove that there was *a substantial likelihood that the defendant had knowledge that another would commit the crime*" (emphasis supplied).

The Commonwealth concedes, and we agree, that the judge misstated the definition of knowledge under joint venture. The correct instruction is that the Commonwealth must prove "that the defendant knew that there was a *'substantial likelihood' that his accomplice would commit the [crime]*" (emphasis supplied). *Commonwealth* v. *Kilburn*, 426 Mass. at 34.

The judge's error, however, did not create a substantial risk of a miscarriage of justice. Here, the trial judge gave the correct instruction with respect to knowledge in her initial charge. Furthermore, after initially misstating the Commonwealth's burden in the supplemental instruction, she stated the correct standard at least six times in the supplemental instruction. The incorrect statement thus was made only once in the context of an instruction that continually emphasized the correct standard

for the knowledge element of joint venture. See *Commonwealth v. Niemic*, 427 Mass. 718, 721 (1998); *Commonwealth v. Sime*, 35 Mass. App. Ct. 928, 929 (1993). Contrast *Commonwealth v. Grant*, 49 Mass. App. Ct. 169, 173 (2000).

Here, in the context of the entire charge, the erroneous instruction could not have misled the jurors.[3]

b. *Joint venture instruction with respect to malice.* The defendant argues that the trial judge's supplemental instruction was erroneous with respect to malice because it invited the jury to consider the defendant's conduct after the murder in finding malice; he argues that the erroneous instruction created a substantial risk of a miscarriage of justice. We disagree.

The defendant points to the following language in the supplemental instruction:

> "[S]pecific intent or intent requires you to look at all the evidence and to see whether or not you infer the necessary mental state or intent from the defendant's knowledge of the circumstances and any subsequent participation in the offense. You may draw reasonable inferences from all the facts and circumstances at the trial."

In instructing the jury that they could rely on all of the facts and circumstances developed at trial, the trial judge did not specifically indicate that the defendant's conduct after the murder should be included in their consideration. In fact, the judge made it clear that the jury should rely on her earlier instruction on specific intent which informed the jury that consciousness of guilt evidence could not be used on the issue of malice. Thus, there was no error in the judge's instruction with respect to malice.

In sum, the judge's entire instructions on the legal principles concerning joint venture made it abundantly clear to the jury that in order to convict the defendant as a joint venturer, there must be sufficient evidence demonstrating that the defendant was present at the commission of the crime with the necessary

---

[3]The defendant claims that trial counsel provided ineffective assistance of counsel in not objecting to the instruction. If omissions of counsel do not present a substantial risk of a miscarriage of justice, there is no basis for an ineffective assistance of counsel claim. *Commonwealth v. Curtis*, 417 Mass. 619, 624 n.4 (1994).

intent and knowledge and that he aided or assisted in the commission of the crime in some manner.[4]

5. *Jury instruction regarding unanimity on theory of malice.* In the course of instructing the jury, the judge defined second-degree murder as consisting of the elements of unlawful killing and malice. The judge correctly stated the three prongs of malice. The judge instructed the jury that they must be unanimous in finding the element of malice. The judge, however, over objection, refused to instruct the jury that a verdict of guilty must be unanimous as to which prong of malice had been proved. The defendant, citing *Commonwealth* v. *Berry*, 420 Mass. 95, 112 (1995), argues that the protection given a defendant (if requested) regarding unanimity in the case of theories of murder in the first degree should be extended to the three ways of proving malice for murder in the second degree.

It is settled that a jury must be unanimous on the theory of culpability for murder in the first degree, i.e., premeditation, extreme atrocity or cruelty, or felony murder. *Commonwealth* v. *Berry, supra* at 112. The reason for this requirement is to prevent a conviction resulting from different jurors concluding that the defendant committed different acts. *Commonwealth* v. *Conefrey*, 420 Mass. 508, 514 (1995). A jury need not, however, unanimously agree on the specific factor that makes a murder, for example, extremely atrocious or cruel. *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). *Commonwealth* v. *Hunter*, 427 Mass. 651, 657-658 (1998). This is because the so-called *Cunneen* factors do not constitute either separate theories of culpability, cf. *Commonwealth* v. *Berry, supra* at 112, or discrete acts or incidents, each of which independently would constitute a crime, cf. *Commonwealth* v. *Conefrey, supra* at 514. See *Commonwealth* v. *Hunter, supra* at 657. Rather, the *Cunneen* factors are evidentiary considerations that guide the jury in determining whether the murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Hunter, supra* at 657-658.

The defendant has not pointed us to any Massachusetts case

---

[4]The defendant claims that "cumulative errors" in the jury instructions created a substantial risk of a miscarriage of justice. As we have held that the one error did not create a substantial risk of a miscarriage of justice, we reject the defendant's claim.

indicating that in cases involving murder in the second degree, an instruction is required on jury unanimity as to which prong of malice has been proved, or even suggesting that such an instruction is required, and we decline to extend to this case the holding of *Commonwealth* v. *Berry, supra.* While the jury must be unanimous in concluding that the defendant acted with malice, there is no requirement that they be unanimous as to how malice was proved. Because the three ways of proving malice in cases involving murder in the second degree relate to evidentiary considerations, not to discrete acts or incidents, see *Commonwealth* v. *Hunter, supra* at 657-658, there is no concern that a conviction will result from different jurors concluding that the defendant committed different acts.

In any event, of the three ways to show malice, only the first prong, i.e., intent to cause death, could possibly have been the basis for the jury's decision here, in light of the fact that the victim was shot several times, at close range, in an execution-type murder. Thus, even if a unanimity instruction were required, its absence did not cause this defendant prejudice.

*Judgment affirmed.*