COMMONWEALTH *vs.* ARCANGEL MORALES.

No. 06-P-961.

Essex. September 11, 2007. - October 17, 2007.

Present: KAFKER, SMITH, & GRAINGER, JJ.

*Homicide. Practice, Criminal,* Instructions to jury.

In the circumstances of a murder trial, the judge erred in instructing the jury,
both in his charge and in response to a jury question, that physical contact
was a necessary component of reasonable provocation and sudden combat
[530-533]; further, the error in the response to the jury question created a
substantial risk of a miscarriage of justice, where the Commonwealth's
case was strong but not overwhelming, where the questions asked by the
deliberating jury demonstrated strongly that they were willing to consider
mitigating circumstances, and where the incorrect response to their ques-
tion was the final instruction before the verdict was returned [533-534].

INDICTMENT found and returned in the Superior Court Depart-
ment on November 20, 2002.

The case was tried before *Thomas P. Billings,* J.

*Elaine Pourinski* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the
Commonwealth.

SMITH, J. On November 20, 2002, the defendant, Arcangel
Morales, was the subject of two indictments, namely, murder in
the first degree, the victim being Michael Carey, and assault
and battery by means of a dangerous weapon on Leola Thomas.
A Superior Court jury convicted him of the lesser offense of
murder in the second degree, and acquitted him of the charge of
assault and battery by means of a dangerous weapon.

On appeal, the defendant argues that (1) the judge erred when
he instructed the jury that physical contact was a necessary
component of either reasonable provocation or sudden combat
required to reduce murder to voluntary manslaughter; (2) his at-

torney was ineffective for failing to object to the instruction; and (3) the evidence was insufficient to prove malice.

*Background.* a. *The Commonwealth's case.* On September 26, 2002, at about 5:30 P.M., the victim, Carey, together with his two close friends, Robert Luiz and Mark Avellino, ate at the homeless shelter where they resided. They drank together on a regular basis, and they may have been drinking before dinner on this particular evening. After dinner, the victim and his two friends took a walk to the liquor store with Thomas and Bonnie Maguire, two women who were also homeless and periodically stayed at the shelter.[1] They purchased approximately one-half gallon of vodka and began to walk behind a nearby strip mall to drink it.

The area behind the strip mall consisted of an alleyway, about 210 feet long, that ran the full length of the building. It included a sidewalk, and together the sidewalk and alleyway were forty-three feet wide. It was bounded on the side opposite the building by a wall that separated the rear of the property from railroad tracks.

As the group rounded the corner of the strip mall, they saw the defendant and his friend, one Richard Valentine. Both men were sitting on the curb in the alleyway drinking beer. The defendant and Valentine were also homeless and frequently stayed at the shelter where they had become acquainted with the individuals in the victim's group. Upon seeing the defendant, Thomas immediately began to scream, "That's him! That's the man that hit me with a beer bottle." Four days earlier, the defendant had struck Thomas on the head with a beer bottle, and as a result, she had received fourteen stitches to her chin. The victim told her, "I'll get him for you." Thomas kept screaming in both English and Spanish, descending into an almost uncontrollable fit of rage as she watched the victim walk toward the defendant.

The victim, flanked at some distance by his companions, Luiz and Avellino, walked to a location not more than three feet from the defendant and Valentine and confronted the defendant. The victim kept asking the defendant, "Why did you hit her

---

[1]Maguire could not be located to testify at the trial. Thomas, Luiz, and Avellino all testified at the trial.

with the bottle?" and "What kind of man are you to hit a woman with a beer bottle?" The defendant took a step or two backwards and replied, "I don't want any trouble from anybody." He had his hand in his pocket.

The evidence from the Commonwealth witnesses regarding precisely what happened next is not entirely consistent. Thomas testified that she was about ten feet away from the defendant when she watched the victim walk up to him. She testified that the defendant was standing on the sidewalk, with his back to the wall, and that his friend Valentine was a few feet to his side. Thomas further stated that the victim's two friends, Luiz and Avellino, were standing around the defendant, at a distance of between fifteen and twenty-five feet.[2] Thomas saw the victim "going after" the defendant, with his hands in motion. Although she testified that she saw the defendant and the victim fighting, Thomas denied seeing the beginning of the fight, or either party make physical contact with the other. Thomas reported that the incident lasted only a few seconds when the defendant ran off, before the victim fell to the ground.

Luiz's description of the beginning of the altercation was similar to Thomas's, except he testified that he immediately began to talk to Valentine, because the two were friendly, and that at the time of the incident they were about twenty-five to thirty feet away. Luiz testified that he turned when he "heard all [their] fighting" and saw what he thought was the defendant punching the victim. Only when he saw a knife in the defendant's hand as he ran from the scene and a bleeding cut in the victim's arm did he realize the defendant had stabbed the victim.

Avellino testified that as the victim pressed the defendant for answers, the defendant backed up so that Avellino was about eight to ten feet away, at most, as he watched the victim confront and question the defendant. Avellino noticed that the defendant had his hands in his pockets as he backed up. He then saw the defendant take a knife out of his pocket and lunge at the victim. The victim had not thrown any punches. The defendant struck the victim two or three times, as the victim "raised his hands in

---

[2]The victim was five feet, eight inches tall and weighed 137 pounds. In his closing argument, the defense attorney made a reference to the defendant being smaller than the victim.

self defense to block the [attack]." According to Avellino, Thomas, Luiz, and Valentine were about fifteen feet away from the defendant and the victim.

Thomas, Luiz, and Avellino all described the defendant and the victim as the only individuals involved in the fight. Within seconds the physical altercation ended, and the defendant fled. The victim was still standing when the defendant left, but collapsed shortly thereafter, and died from two stab wounds to his chest. There was a third superficial stab wound to the victim's arm.

b. *The defendant's case.* At trial, the defendant did not deny that he stabbed the victim. He claimed, however, that he acted in self-defense. The defendant's version of events was admitted in evidence through his statement to the police, which was recorded and transcribed, and offered during the Commonwealth's case-in-chief. Valentine also testified on behalf of the defendant.

In his statement, the defendant recounted that on the day of the stabbing, he and Valentine purchased some beer to drink around 6:00 P.M. They had just sat down to drink it outside of a Chinese restaurant, when the defendant saw Thomas coming down the street, accompanied by three men. The defendant told police that he had been having problems with Thomas for several days and that because of those difficulties he had "had to smash a bottle on her head." In the intervening four days between that incident and the one in question, Thomas had twice, if not four times, sent and encouraged different groups of men to confront the defendant. On each occasion, the defendant was able to avoid a physical altercation by walking away. He felt threatened, however, by the persistent nature of the confrontations, and purchased a knife.

When the defendant saw Thomas on the night in question, with three other men, he suggested to Valentine that they go behind the building to avoid yet another confrontation. Almost as soon as they sat down, Thomas and her group rounded the corner of the building and she began screaming at the three men to "get" the defendant. The three men came toward him, as Thomas continued to scream at them to "jump" him. The defendant told the police that he kept backing up and the three men hesitated. He could not understand everything the men

were saying because they were speaking English and he primarily spoke Spanish.

The defendant told the police that he was surrounded by three men, who were bigger and stronger than he was, and he believed that they were going to hit him and that if they hit him, they would kill him. The defendant stated that the victim threw two punches at his face but missed,[3] and he lunged at the victim with the knife and stabbed him three times. The victim was still standing and the defendant left. That night the defendant took a bus to Reading, Pennsylvania, where his brother-in-law lived.

Valentine's testimony was similar to the defendant's. Valentine testified that Thomas's group came around the corner of the building and the three men surrounded the defendant as Thomas screamed, "He's got to pay . . . . That bastard's got to pay." Valentine unsuccessfully tried to calm Thomas down, and when he looked toward the defendant, he saw him fighting with the victim. When asked whether he saw any physical contact between the combatants, Valentine replied, "They were just swinging at each other," and that he saw them exchanging blows. When the fight broke out, Valentine said Luiz and Avellino were about fifteen feet away. At the end of the fight, the defendant walked away. The defendant had told Valentine earlier in the day that he would be leaving for Pennsylvania.

*Discussion.* The judge charged the jury on murder in the first degree under a theory of premeditation, murder in the second degree, and voluntary manslaughter, as well as self-defense. The voluntary manslaughter charge encompassed three theories: heat of passion on reasonable provocation, heat of passion on sudden combat, and excessive use of force in self-defense. The jury were provided with a chart outlining elements of the different charges.

In regard to reasonable provocation, the judge instructed the jurors that "[m]ere words, no matter how insulting or abusive, standing alone would not constitute reasonable provocation," but that "[p]hysical contact, on the other hand, even a single

---

[3]The defendant's statement to the police that the victim threw punches at him but missed underlies his claim that the judge improperly instructed the jury that there had to be physical contact in order for them to find heat of passion upon reasonable provocation.

blow[,] may amount to a reasonable provocation." There was no objection to the judge's instructions.

On the second day of deliberations, the jurors asked the judge the following question: "Theoretically, if one person takes a swing at another person and misses, does that constitute reasonable provocation or sudden combat, or does there have to be physical contact to induce heat of passion"?[4]

The judge consulted with the prosecutor and defense counsel. He concluded that there had to be physical contact in order to have reasonable provocation. He instructed the jury, in relevant part, as follows:

> "For there to be reasonable provocation, either sudden provocation or sudden combat, there would need to be physical contact. Even a single blow would be enough, but words and verbal abuse, [] no matter how insulting or obscene, is not enough."

There was no objection to the instruction. On appeal, the defendant argues that the judge's answer to the jury's question was reversible error because, depending on the circumstances, physical contact is not necessary in order to establish reasonable provocation or sudden combat.

Voluntary manslaughter has long been defined as a "killing committed in 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Colon*, 449 Mass. 207, 220 (2007), quoting from *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987). "There must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened

---

[4]On the first day of deliberations, the jury asked the following question:

> "Can the judge clarify 2A [referring to the chart of elements], heat of passion upon a reasonable provocation, and what is acceptable time frame for the above?"

With the agreement of counsel, the judge reinstructed the jury on the theory of provocation, also reminding the jurors that it was the Commonwealth's burden to prove the absence of heat of passion in order to establish motive.

actually did produce such a state of mind in the defendant."
*Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). A vol-
untary manslaughter instruction based on reasonable provoca-
tion is appropriate "if there is evidence of provocation deemed
adequate in law to cause the accused to lose his self-control in
the heat of passion, and if the killing followed the provocation
before sufficient time had elapsed for the accused's temper to
cool." *Commonwealth* v. *Colon*, 449 Mass. at 220, quoting from
*Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996).

The definition of voluntary manslaughter does not contain
any express requirement that physical contact is necessary in
order for the jury to consider reasonable provocation or sudden
combat, nor have we been referred to any decision that so states.
Further, appellate courts have ruled under similar circumstances
that a manslaughter instruction based on reasonable provocation
was warranted, even where no physical contact by the victim
preceded the defendant's attack. See, e.g., *Commonwealth* v.
*Schnopps*, 383 Mass. 178, 180-182 (1981) (evidence of sudden
admission of adultery equivalent to discovery of act itself, and
sufficient evidence of provocation to require manslaughter in-
struction); *Commonwealth* v. *Rodriguez*, 58 Mass. App. Ct. 610,
613-614 (2003) (defendant entitled to reasonable provocation
instruction where he armed himself with a knife but stood apart
from the group and only swung the knife, with his eyes closed,
when he was being attacked by five or more men); *Common-
wealth* v. *Fortini*, 68 Mass. App. Ct. 701, 705-707 (2007) (be-
cause the jury could have found that the defendant "was
genuinely surprised when the victim appeared on foot and ag-
gressively approached him," he was entitled to proper instruc-
tion on provocation even though the victim had neither made
contact nor displayed a weapon before the defendant shot and
killed him).[5]

In the circumstances present here, we hold that the judge's

---

[5]We are also aware of decisions in which the court has held that physical
contact by victims was insufficient to justify such an instruction. See *Com-
monwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973), *S.C.*, 391 Mass. 123
(1984) ("[i]t is an extravagant suggestion that scratches by the wife could
serve as provocation for a malice-free but ferocious attack by the defendant
with a deadly instrument"). See also *Commonwealth* v. *Curtis*, 417 Mass.
619, 629 n.6 (1994) (decisions listed in which the victim strikes the first blow

instruction to the jury that physical contact was required for heat of passion upon reasonable provocation was error.

Viewing the evidence in the light most favorable to the defendant, see *Commonwealth* v. *Fortini, supra* at 706, a properly instructed jury could have concluded that the defendant was surrounded by three men who were physically larger than he and, who, at the direction of Thomas, were approaching him in order to "get him," "jump him." The defendant had previously sought to avoid Thomas because of the problems he had had during the past week with her. The defendant told the victim and others that he did not want any trouble. Nevertheless, the victim continued to question the defendant about why he would hit a woman, as he moved forward toward the defendant, flanked on either side by his friends. The victim threw some punches, although not hitting the defendant, before the defendant lunged at him with the knife.

In these circumstances, "[a] properly instructed jury could have concluded that a reasonable person in the defendant's position would have felt an 'immediate and intense' threat and responded as he did." *Commonwealth* v. *Fortini, supra* at 706, quoting from *Commonwealth* v. *Amaral,* 389 Mass. 184, 189 (1983). Therefore, the judge committed error in his answer to the jury's question.

Because there was no objection to the incorrect answer to the jury's question, we review the error to determine whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Alphas,* 430 Mass. 8, 13 (1999). "In doing so, we read the judge's charge as a whole to determine whether there is a 'substantial danger that the jury were misled by the erroneous instruction, and [whether] the instruction may have materially influenced their appraisal of the [evidence].' " *Commonwealth* v. *Gendraw,* 55 Mass. App. Ct. 677, 687 (2002), quoting from *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967).

---

but the contact is insufficient to mitigate the homicide); *Commonwealth* v. *Bianchi,* 435 Mass. 316, 329 (2001) (no adequate provocation where female victim called defendant obscenity and punched him in face, where defendant was weightlifter, outweighed victim by over 170 pounds, was armed with fully loaded weapon, and was violating protective order in pursuing victim).

"The jury need not have been convinced beyond a reasonable doubt that the defendant reasonably was provoked: they only would need to harbor a reasonable doubt on the issue." *Commonwealth* v. *Acevedo*, 446 Mass. 435, 450 (2006).

The Commonwealth's case was strong, but not overwhelming. The Commonwealth's evidence showed that the victim, at the urging of Thomas, approached the defendant in a confrontational manner. There was evidence from the Commonwealth witnesses that the defendant stated that he did not want any trouble. The jury convicted the defendant of murder in the second degree, rather than murder in the first degree, thus rejecting the Commonwealth's theory of deliberate premeditation.[6]

The questions asked by the deliberating jury are of significance in that they may demonstrate the jury's focus. The jury's first question, see note 4, *supra*, submitted early in their deliberations, suggested that they were willing to consider mitigating circumstances. Their second question, to which the judge gave the incorrect answer, demonstrated strongly that they were willing to consider reasonable provocation as a mitigating factor. See *Commonwealth* v. *Acevedo*, *supra* at 450. Further, the incorrect instruction was the final instruction before the verdict was returned. See *Commonwealth* v. *Carlino*, 429 Mass. 692, 695-696 (1999); *Commonwealth* v. *Rodriguez*, 58 Mass. App. Ct. at 617-618. We hold that the incorrect answer to the jury's second question created a substantial risk of a miscarriage of justice.

For the above reasons, the judgment is reversed, the verdict is reversed, the verdict is set aside, and the case is remanded to the Superior Court for trial.

*So ordered.*

---

[6]The defendant also argues that the evidence was insufficient to sustain the verdict because malice had not been proven. Now considering the evidence in the light most favorable to the Commonwealth, we view the defendant's use of a knife to stab the victim in the chest two times as sufficient to demonstrate the requisite intent. See *Commonwealth* v. *Guy*, 441 Mass. 96, 107 (2004) (it is well established that the "jury are permitted to infer malice from the use of a dangerous weapon").

The defendant argues furthermore that his trial counsel's failure to object to the incorrect instruction constituted ineffective assistance of counsel. Our holding makes it unnecessary to consider this claim.