## COMMONWEALTH *vs.* TITUS COLEMAN.

No. 98-P-1330.

Suffolk. November 18, 1999. - April 21, 2000.

Present: PORADA, KAPLAN, & GILLERMAN, JJ.

*Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession. *Evidence,* Admissions and confessions.

The circumstances of three police officers' aggressive and persistent interrogation of a nineteen year old man on whom suspicion had focused, in a small closed room from which he could not leave, constituted a custodial interrogation requiring the administration of Miranda warnings; where no such warnings were given, the defendant's resulting incriminating statements should have been suppressed. [153-156]

COMPLAINT received and sworn to in the South Boston Division of the District Court Department on February 21, 1997.

A pretrial motion to suppress evidence was heard by *Robert C. Rufo,* J., and, on transfer to the Dorchester Division, the case was tried before *Sarah B. Singer,* J.

*Christine M. Nicastro* for the defendant.

*Kristine Luongo Tammaro,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant Titus Coleman appeals from his District Court conviction under G. L. c. 269, § 10(*a*), of illegal possession of a handgun. Agreeing with the defendant's contention, we hold that the judge erred in failing to suppress statements secured by the police from the defendant in the course of a custodial interrogation conducted without the necessary Miranda warnings. Accordingly, we shall reverse the conviction for a new trial.[1]

---

[1]Two procedural points: A single justice of the Supreme Judicial Court denied the defendant's application for interlocutory review of the motion

1. Sergeant Mark Gillespie, the sole witness for the Commonwealth at the suppression hearing, testified that around 6:00 P.M., January 6, 1997, he and other Massachusetts Bay Transportation Authority officers, including officers Christopher Baker and Michael Adamson, responding to a call, went to the Andrew Square "T" station and commenced efforts to find the person who had fired a weapon in the station.

The police continued to work on the case, and some two weeks later, on January 19, 1997, Gillespie and the two other officers already named went to 5 Dever Street, in the Dorchester section of Boston, the address of Janice Flemon, the defendant's aunt, with whom the defendant was then living. Entering the living room of the house, Gillespie introduced himself to Flemon and told her the purpose of the visit, to speak with the defendant. There were others in the living room and hallway. The defendant was out of the house on an errand, but soon appeared.

Gillespie asked Flemon whether a more private place was available and she directed him to a bedroom nearby. The defendant entered with the officers.[2] The room measured eleven by twelve feet. The defendant sat on the edge of the bed with Officer Baker sitting alongside. Gillespie and Officer Adamson remained standing, blocking the door of the room, now closed. The officers were white men, about six feet tall, the defendant black, aged nineteen, educated to grade eleven.

Gillespie testified that by the time of this interview the defendant Coleman had become "the focus of th[e] investigation." In effect he communicated this fact to the defendant by stating promptly that he had a "theory" of the case about which he was confident, namely: the defendant had fired a handgun in the station intending to scare members of the Columbia Point Dogs gang who were pursuing and threatening him, but without intending, so Gillespie said, actually to strike anyone. The gun

judge's order refusing suppression.

Following that order and just before commencement of the trial, the Commonwealth presented proof to the judge mainly repetitious of its proof at the suppression hearing: counsel was evidently proceeding in the mistaken belief that that was the way to carry out the "humane" rule. The trial judge (who had not served as motion judge) received the proof in the mistaken belief that she was hearing an initial suppression motion. When better informed, she stopped the hearing; the testimony was received irregularly and is disregarded.

[2]The defendant at first did not recognize Gillespie as the officer who had spoken with him near the scene on January 6.

used, with four unspent rounds, had been retrieved on the night of the episode at a street near the site.

As proof of his theory, Gillespie produced a fingerprint card which, he told the defendant, showed the defendant's fingerprint taken from the clip of the gun. In truth, as Gillespie conceded in his testimony, the Commonwealth had no such fingerprint evidence; Gillespie had knowingly uttered a falsehood (in which the other officers presumably acquiesced).[3] The defendant responded to the fingerprint ruse by admitting he had "touched" the gun. He continued denying he had fired it.

Gillespie said he did not believe the defendant's denial, and he repeated he believed the defendant had fired the gun. However, said Gillespie, the defendant could be confronted with much more serious charges than untargeted firing. He said the police were trying to find Christopher Jaundoo, a member of the Columbia Point Dogs gang, a formidable enemy, much feared. Jaundoo might decide to "cooperate" with the police and assert that the defendant had fired at him intending to strike and kill him.[4] Even if the police did not themselves believe this assertion, they might charge the defendant, and be justified in charging him, with an assault with intent to murder in line with Jaundoo's claim.[5] Gillespie went on to urge the defendant to tell the truth, to confess, in order to avoid grave peril. Quite clearly, the defendant was to realize that if he confessed, he need not fear the intervention of Jaundoo; the police would take care of it.

Gillespie pushed further to induce a confession: if the defendant persisted in denials, he would be arrested and handcuffed and taken in on the spot in front of his aunt and others; if he confessed, he would not be arrested but would rather be summoned into court "without handcuffs or shackles on him."

---

[3] As to the purpose of the ruse, Gillespie said he "wanted to get the admission from him that [Gillespie] felt . . . had happened, that [the defendant] had handled that gun and had fired that gun."

[4] Gillespie said, "And I told him [the defendant] if Christopher Jaundoo is found and decides to cooperate with this investigation there was a distinct possibility that he could be charged with a more serious offense than just firing a gun." Otherwise put, if Jaundoo "was willing . . . to identify himself as a victim to me," the more serious crime could be charged.

[5] Gillespie lent some substance to this threatened prosecution by suggesting that Jaundoo's sister said he (Jaundoo) told her he was actually shot at in Andrew station.

Gillespie testified he told the defendant up to three times he could leave the room if he wished. After thirty minutes, the defendant began to weep and told a story, as recounted by Gillespie and noted in the margin, which, in the end, contributed to his conviction at trial.[6] (Also set out in the margin is the tenor of the testimony of the defendant, sole witness for the defense at the hearing.[7] )

2. The issue on this appeal is whether the colloquy described by Sergeant Gillespie figures as a "custodial interrogation" of the defendant, the term being defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). A situation of custodial interrogation would call for "procedural safeguards effective to secure the [person's] privilege against self-incrimination": thus the safeguard of Miranda warnings about constitutional rights. *Ibid.*

We follow the customary four-point approach to questions of

---

[6]According to Gillespie, the defendant's account ran thus. Jeremy Thompson earlier that day, January 6, asked the defendant to go with him and Stanley Flemon (the defendant's cousin) to the Cambridgeside Galleria mall. The defendant did not want to go because he feared Columbia Point Dogs would be there and he would be in danger. Thompson insisted; he said he had something to give him to insure safety. That was a handgun which Thompson passed to the defendant. When the defendant, Thompson, and Stanley Flemon got to the mall they ran into the gang. The three as well as the gang members were ejected from the mall by security guards. All went over to the Lechmere "T" station; the defendant and his two companions entered a car of the trolley to Park Street, the gang members a second car. Boarding a southbound Red Line train to go home to Dorchester, the defendant found himself temporarily separated from the two others and in a car with gang members. Christopher Jaundoo and others approached the defendant ready to fight. The defendant was in fear. As the defendant and Thompson and Flemon began to leave the station a bottle was thrown at them. The defendant turned and fired one round of the handgun at the ground. He handed the gun to Thompson and ran up Boston Street to Edward Everett Square.

[7]In summary, the defendant took the stand to contradict the police account that he had admitted in the course of the interview to handling the gun and firing it. He had denied both allegations and continued to deny them. But he was under severe pressure, "didn't know what to do" (as his lawyer put it), because the police threatened to take him in on the spot and put him in handcuffs and arrest him and charge him with attempted murder. Finally, he signed a paper (not introduced in evidence) without really understanding what he signed.

this order suggested by *Commonwealth* v. *Bryant,* 390 Mass. 729, 737 (1984).[8]

(1) *Place of interrogation.* As the questioning, haranguing, and confrontation began and wore on on January 19, there was a measure of physical oppressiveness caused by the presence and deployment of the three officers in a small room, with the way to the closed door shadowed by the questioner himself. The situation was to a degree "isolating and coercive." See *Commonwealth* v. *Gallati,* 40 Mass. App. Ct. 111, 113 (1996).

(2) *Focus on defendant.* Gillespie testified that the police investigation had become focused on the defendant — the police, in other words, believed the defendant to be presumptively responsible for the shooting. However, "the subjective beliefs held by law enforcement officers are irrelevant in the determination whether a person being questioned is in custody for purposes of the receipt of Miranda warnings, except to the extent that those beliefs influence the objective conditions surrounding an interrogation." *Commonwealth* v. *Morse,* 427 Mass. 117, 123-124 (1998). See *United States* v. *Ventura,* 85 F.3d 708, 711-712 (1st Cir. 1996). "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda* . . . [s]ave as they [the suspicions] are communicated or otherwise manifested to the person being questioned . . . ." *Stansbury* v. *California,* 511 U.S. 318, 324 (1994). Again, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but "[t]hose beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' " *Id.* at 325, quoting from *Berkemer* v. *McCarty,* 468 U.S. 420, 440 (1984).

In the present case, the officers' belief that the defendant was

---

[8]The four factors as set out in *Bryant*: "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest."

guilty of firing the gun was unmistakably and forcefully conveyed to him. Gillespie announced at the beginning he had a theory that the defendant had committed a crime, and he supported this theory by the false attribution of the fingerprint. At once the defendant would understand he was the prime suspect. His "freedom" was thus threatened and limited. This was followed by the defendant's admission that he had in fact handled the gun; further sustained pressure elicited the final, full confession.

(3) *Nature of interrogation.* The questioning was aggressive and persistent. The defendant's denials were scorned and overridden. Indeed, the interview was largely one-sided; there was little contribution by the defendant. Although voices may not have been raised, and a conversational tone maintained, the substance of what was said was harsh and intended by the questioner to be so. The interrogatory part of "custodial interrogation" looks to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), and such was the interrogation here.

(4) *Possibility of ending interview.* The consequences of the defendant's simply getting up and leaving the room in the midst of the interrogation (if permitted), were so dire and so plainly put to the defendant, that he was effectively tied down by psychological forces.[9] For if the defendant reached the outdoors, he would be arrested and handcuffed on the spot and would then face the prospect of confronting very serious charges in addition to the obvious one of unlawful possession. The police manipulation with the fingerprint card suggests that their search for Jaundoo and the threat of his accusation may also have been fabrications, but the defendant could not bank on this. The Jaundoo story, true or false, acted as another lock on his freedom to act.[10] In this setting any suggestions to the defendant that he might leave would be meaningless mouthings.

---

[9]The court in *Bryant* considered whether the defendant was "either mentally or physically intimidated." 390 Mass. at 739. See *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) ("In determining whether a suspect is 'in custody' at a particular time we examine the extent of the physical or psychological restraints placed on the suspect during interrogation . . .").

[10]*Commonwealth v. Magee*, 423 Mass. 381, 385 (1996), is similar in that the defendant could understand she could refuse to answer questions only at the expense of being denied access to a mental facility which she urgently

We conclude that on all counts taken together the record discloses a custodial interrogation where Miranda warnings were required but unfortunately not given. The judge's findings supporting a contrary view were in a material part unfaithful to the testimony at the suppression hearing.[11] The judge stated, "I did not credit the testimony of the defendant that he was told he would be charged with attempted murder if he did not confess to shooting the gun at Andrew Station . . . ." This overlooks and makes no mention of the testimony by Gillespie himself that he had told the defendant he could be prosecuted for assault with intent to murder on Jaundoo's putative claim he had been shot at. So also the judge found that Gillespie said he would not arrest the defendant, but omits that this treatment was conditioned on the defendant's confessing. The findings accept an unrealistically bland interpretation of the interview, suggesting that the defendant was at liberty to leave at any time: lacking was analytic attention to the forces evident in the testimony that operated on the defendant and tended to immobilize him. The conclusions of law cite the *Bryant* case but without a pursuit of the *Bryant* factors, point by point, that would, we think, have led the judge to an opposite result.

"The basic inquiry is whether, from the point of view of the defendant, the interrogation took place in a coercive environment." *Commonwealth* v. *Conkey*, 430 Mass. 139, 144 (1999). It did so in the present case.

The order denying the motion to suppress is reversed. The judgment is reversed and the verdict is set aside.

*So ordered.*

---

needed: in reality she had no choice. See *Commonwealth* v. *Gallati*, 40 Mass. App. Ct. at 114-115.

The recent *Commonwealth* v. *Ramos*, 430 Mass. 545, 549-550 (2000), is somewhat analogous: the defendant was held "seized" under art. 14 when the police by a ruse left her with no seeming alternative but to leave her apartment, which she had refused to do, thus exposing herself to being photographed, as the police desired.

[11]"In reviewing a motion judge's decision, we give substantial deference to the judge's ultimate findings of fact and conclusions of law, but we independently apply the constitutional principles to the facts found." *Commonwealth* v. *Conkey*, 430 Mass. 139, 144 (1999).