NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1751                                        Appeals Court

 COMMONWEALTH  vs.  KEITH CAWTHRON (and three companion cases[1]).


No. 15-P-1751.

Middlesex.      November 10, 2016. - January 6, 2017.

Present:  Trainor, Meade, & Hanlon, JJ.


Controlled Substances.  Practice, Criminal, Motion to suppress,
    Admissions and confessions.  Evidence, Admissions and
    confessions.  Constitutional Law, Admissions and
    confessions, Investigatory stop.  Due Process of Law,
    Police custody.


    Indictments found and returned in the Superior Court
Department on April 24, 2014.

    Pretrial motions to suppress evidence were heard by Kenneth
W. Salinger, J., and a motion for reconsideration was considered
by him.

    An application for leave to prosecute an interlocutory
appeal was allowed by Margot Botsford, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.


    Timothy Ferriter, Assistant District Attorney, for the
Commonwealth.
    Thomas M. Glynn for Keith M. Cawthron.
    Daniel E. Callahan, Committee for Public Counsel Services,
for Craig Flodstrom.

    _____

    [1] One against Cawthron and two against Craig Flodstrom.

MEADE, J.  A Middlesex County grand jury indicted the defendant, Keith M. Cawthron, and the codefendant, Craig Flodstrom, for trafficking in an amount more than eighteen and less than thirty-six grams of oxycodone, in violation of G. L. c. 94C, § 32E(c)(1), and conspiracy to traffic oxycodone, in violation of G. L. c. 94C, § 40.  Prior to trial, the defendants moved to suppress the oxycodone and statements they made at the time they were stopped by the police.  After conducting an evidentiary hearing, the motion judge issued findings and an order that allowed Cawthron's motion to suppress in full, and allowed Flodstrom's motion to suppress in part and denied it in part.[2]  The Commonwealth timely noticed an appeal, and a single justice of the Supreme Judicial Court allowed the Commonwealth's application for leave to pursue an interlocutory appeal and reported the matter to this court.  See G. L. c. 278, § 28E; Mass.R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996).

This appeal presents the question whether the conduct of the police officers, during the course of an investigatory stop, elevated that stop to one of custodial interrogation requiring the recitation of Miranda rights.  The motion judge determined that it did.  We reverse.

---

[2] The Commonwealth's motion to reconsider was denied.

1.  Background.  Detective Michael Donovan and Detective Lieutenant Ryan Columbus of the Tewksbury police department testified at the motion hearing.[3]  The motion judge made detailed findings of fact to support his order, as summarized below.

During the afternoon of April 12, 2013, Donovan stopped at a convenience store on Route 133 in Tewksbury to buy something to drink.  Donovan was dressed in plain clothes and driving an unmarked car.  As he approached the store, Donovan overheard Cawthron speaking to someone on his cellular telephone in the parking lot.  Cawthron said, "I'm going to pick them up now.  How many do you want?  Do you want ten?"  Based on his training and experience, Donovan reasonably believed that the discussion related to the sale of illegal narcotics.  Donovan made note of the New Hampshire vanity license plate on the black Ford sport utility vehicle (SUV) Cawthron was driving, and followed the SUV as it left the parking lot.

Donovan followed Cawthron on Route 133, first to a McDonald's restaurant, where Donovan temporarily lost sight of Cawthron, and then minutes later to a LongHorn Steakhouse parking lot where Donovan saw Cawthron's SUV with the same license plate.  Donovan was able to park his unmarked car about fifteen to twenty yards away from Cawthron's SUV.  While he

---

[3] The motion judge found the testimony of the two detectives to be credible to the extent their testimony was "consistent with the [judge's] express findings of fact."

followed Cawthron, Donovan contacted Columbus, who arrived in an unmarked car and began surveillance from an adjacent hotel parking lot. The detectives were aware that the parking lots in this area of Route 133 were often used as meeting points for drug trafficking, and they had made many arrests for such offenses in this area.

From his vantage point, Donovan watched Cawthron speaking on his cellular telephone for five minutes. After that time, Flodstrom arrived and parked his black Ford Escape next to Cawthron's SUV. Flodstrom got out and approached Cawthron who was outside his SUV. The two men stood and spoke to one another near their cars. From his vantage point fifteen to twenty yards away, Donovan saw Flodstrom and Cawthron shake hands and exchange items. While Donovan could not see what the items were, based on what he earlier heard Cawthron say at the convenience store, his knowledge of the area along Route 133, and his training and experience, he believed that he had just witnessed a hand-to-hand drug transaction.

At this point, Donovan got out of his car and quickly approached Cawthron and Flodstrom. Within one minute, Columbus drove from the neighboring parking lot to join Donovan with the defendants. Donovan was wearing his police badge around his neck and identified himself to the defendants as a police officer. He did not draw his weapon, but he ordered the

defendants to stay where they were.  Flodstrom said, "[T]his is how I feed my family," or words to that effect.  When Columbus approached on foot, he also was dressed in plain clothes with his badge displayed.  The detectives separated the two defendants, each five yards from the other, "before they had a chance to get their stories straight."  Without touching him, Donovan instructed Flodstrom to come with him to the side of Flodstrom's car.  Columbus had Cawthron, who stood outside his SUV, join him on the far side of Cawthron's SUV.  Cawthron was "very cooperative" and "compl[ia]nt."

After Donovan and Flodstrom moved away from the other two, Donovan provided Flodstrom with Miranda warnings that the motion judge found to be incomplete.[4]  While the motion judge did not specify how the warnings were deficient, he did find that Donovan did not read the rights to Flodstrom but merely recited

---

[4] The motion judge found that "Donovan gave some sort of oral Miranda warnings to Flodstrom.  Donovan did not read the warnings from a printed card.  He instead did his best to recite them from memory."  However, these findings are not supported by the record.  Donovan testified that Flodstrom "was read his Miranda rights."  When asked by the motion judge to clarify where in the sequence of events he "read" Flodstrom his Miranda rights, Donovan clarified that Flodstrom was "read his Miranda rights" after he and Cawthron were separated by the detectives.  Later, Donovan testified that after Flodstrom received his Miranda warnings, Donovan asked if Flodstrom understood those rights, and he indicated that he did.  There is simply no evidence to support the judge's finding that Donovan did not read the Miranda rights, that those rights were incomplete, or that Donovan recited them from memory.  Given our resolution of the case, this requires no further discussion.

them from his memory. As such, the motion judge found that the Commonwealth failed to prove that Donovan informed Flodstrom of every necessary part of the Miranda warnings. Without complete Miranda rights, and no request to Flodstrom if he wished to waive his rights, or whether he understood his rights,[5] the motion judge found that no proper waiver occurred before Flodstrom made a statement.[6]

In a "[m]edium" or "regular tone," Donovan asked Flodstrom what had just occurred between him and Cawthron. In response, Flodstrom admitted that he had sold oxycodone pills to his uncle (Cawthron) for two dollars per pill, and again stated that this was how he fed his family. When asked for the money, Flodstrom retrieved $600 in cash from his pocket and gave it to Donovan.

---

[5] Although the motion judge credited Donovan's testimony that nothing led him to believe that Flodstrom was under the influence of drugs or alcohol, the judge nonetheless found that Donovan "took no affirmative steps to ensure that Flodstrom's mind was clear and that he was able to understand his Miranda rights and to knowingly and intelligently waive them."

[6] The motion judge found that the Commonwealth "failed to prove beyond a reasonable doubt that Donovan remembered to inform Flodstrom of every necessary part of the Miranda warnings." However, because "[n]o prescribed set of words must be used to provide the warnings required by the Miranda case," Commonwealth v. Ghee, 414 Mass. 313, 318 (1993), this misstates the Commonwealth's burden of proof. Rather, the burden is on the Commonwealth to establish "beyond a reasonable doubt, in the totality of the circumstances," that a defendant's waiver of his Miranda rights "was voluntary, knowing, and intelligent, and that his statements were voluntary." Commonwealth v. Brown, 474 Mass. 576, 581 (2016), quoting from Commonwealth v. Auclair, 444 Mass. 348, 353 (2005). Again, given our resolution of the case, this requires no further discussion.

Flodstrom told Donovan he had just sold 300 pills to Cawthron. Donovan placed him under arrest. During Donovan's conversation with Flodstrom, neither of them raised their voices.

While this was occurring, Columbus identified himself as a police officer and asked Cawthron, "What did you just buy?" Cawthron admitted that he had bought pills from Flodstrom for two dollars each. When asked, Cawthron told Columbus that the pills were under the seat of his SUV. Without permission from Cawthron, Columbus opened the door to the SUV and found the pill bottle under the driver's seat. Columbus then placed Cawthron under arrest and read him his Miranda rights. After further questioning, Cawthron told Columbus that he was meeting a friend and that he was just acting as the "middle man." Prior to handcuffing and placing Cawthron under arrest, Columbus characterized the tone of their conversation as "[v]ery cooperative." Columbus never raised his voice and never "reveal[ed]" his service weapon.

After placing Cawthron under arrest, Columbus showed Donovan the pill bottle in front of Flodstrom, and then gave it to Donovan. The motion judge found that this occurred while Donovan was still questioning Flodstrom and before he was placed under arrest. The motion judge found that Donovan placed Flodstrom under arrest based on what he had told Donovan and the discovery of the pill bottle in Cawthron's SUV. The motion

judge "infer[red] and f[ound]" that Columbus searched Cawthron's SUV and seized the pill bottle before Donovan finished reciting the Miranda warnings to Flodstrom, and before Flodstrom told Donovan that he had just sold the pills to Cawthron.

The motion judge further found that neither detective told the defendants that they were free to leave, that they could stop questioning at any time, or that they would be free to leave after they were asked a few questions. The motion judge added that the detectives made no attempt to record the interviews on a "smart" cellular telephone or by some other recording device. After the defendants were driven away by other officers, a further search of the defendants' cars proved fruitless.

2. Discussion. When reviewing a motion to suppress, "we adopt the motion judge's factual findings absent clear error." Commonwealth v. Isaiah I., 450 Mass. 818, 821 (2008), citing Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004). "We take the facts from the judge's findings following a hearing on the motion to suppress, adding those that are not in dispute, and eliminating those that, from our reading of the transcript, are clearly erroneous." Commonwealth v. Castillo, 89 Mass. App. Ct. 779, 781 (2016), quoting from Commonwealth v. Wedderburn, 36 Mass. App. Ct. 558, 558-559 (1994). "A finding is clearly erroneous when 'although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Commonwealth v. Castillo, supra, quoting from Green v. Blue Cross & Blue Shield of Mass., Inc., 47 Mass. App. Ct. 443, 446 (1999). "Our review of the application of constitutional principles to those facts, however, is plenary." Commonwealth v. Watts, 74 Mass. App. Ct. 514, 516-517 (2009), quoting from Commonwealth v. Kaupp, 453 Mass. 102, 105 (2009).

The Fifth Amendment to the United States Constitution, which is applicable to the Commonwealth by virtue of the Fourteenth Amendment, see Malloy v. Hogan, 378 U.S. 1, 6 (1964); Commonwealth v. Gelfgatt, 468 Mass. 512, 519 n.12 (2014), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. Id. at 467. See Commonwealth v. Simon, 456 Mass. 280, 285 (2010). The Court observed that "incommunicado" interrogation in an "unfamiliar," "police-dominated atmosphere" involves psychological pressures that "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda v. Arizona, supra at 456-457, 467. Consequently, the

Court reasoned that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." Id. at 458.

Here, the motion judge concluded that "the police subjected Cawthron and Flodstrom to custodial interrogation and were therefore required to give full and complete Miranda warnings before questioning either defendant." We disagree.[7] Whether the police have conducted custodial interrogation of a suspect is a question of Federal constitutional law. See Commonwealth v. Morse, 427 Mass. 117, 123 (1998); Commonwealth v. Sneed, 440 Mass. 216, 220 n.7 (2003). See also Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 18-2[d], at 18-14 (2016). It is the defendant's burden to establish the necessary facts to prove custody. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999).[8] The test is an objective one. Ibid. See Stansbury

---

[7] The motion judge properly determined that the initial stop of the defendants was justified based on Detective Donovan's reasonable suspicion that he had witnessed an illegal drug transaction. See Commonwealth v. Santiago, 470 Mass. 574, 579 (2015). Also, given the result we reach, there is no need to address the question whether Flodstrom had "automatic standing" to challenge the recovery of the pills from Cawthron's SUV. Commonwealth v. Amendola, 406 Mass. 592, 601 (1990).

[8] Only after a defendant has carried that burden must the Commonwealth demonstrate that he knowingly and intelligently waived his privilege against self-incrimination. See Miranda v. Arizona, supra at 475; Commonwealth v. Alcala, 54 Mass. App. Ct. 49, 53 (2002).

v. <u>California</u>, 511 U.S. 318, 319 (1994) ("an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody").

"The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." <u>Commonwealth</u> v. <u>Groome</u>, 435 Mass. 201, 211 (2001).  In determining whether a defendant was in custody, "the court considers several factors: (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."  <u>Id</u>. at 211-212.

Here, the motion judge found:

"Given the totality of the circumstances, any reasonable person in the same situation would have understood that they were not free to leave, would have perceived each officer's questions as interrogations compelled under the implicit threat of force, not as relaxed or friendly conversations, and would therefore have experienced the interrogation as coercive."

As a result, the motion judge determined that Miranda warnings should have been provided to the defendants prior to any questioning.

a. Clearly erroneous findings. As an initial matter, the Commonwealth claims that some of the motion judge's findings of fact are unsupported by the record. We agree. The judge found that the detectives' interactions with the defendants were not "relaxed or friendly conversations." However, the detectives (the only witnesses who testified at the evidentiary hearing) provided no testimony to support such a finding. Rather, Detective Donovan testified that when he spoke to Flodstrom, he did so in a "[m]edium, just regular tone." Donovan told Flodstrom, "[C]ome over here; I want to talk to you." Detective Columbus testified that during his conversation with Cawthron, he never raised his voice. Columbus stated that Cawthron was "just standing there," and characterized him as "compl[ia]nt." Moreover, both detectives were in plain clothes, with their badges displayed, but with their guns remaining holstered the entire time. There was no evidence to the contrary suggesting any type of aggressive questioning. We, therefore, eliminate from our analysis the judge's finding that the conversations were not "relaxed or friendly" as clearly erroneous. See Commonwealth v. Wedderburn, 36 Mass. App. Ct. at 558-559.

Also, the judge found that the detectives made it known to Flodstrom that he was a suspect by Donovan giving Flodstrom "some sort of oral Miranda warnings,"[9] and that during the initial questioning of Flodstrom, Columbus indicated that he found the pill bottle in Cawthron's SUV and handed the pill bottle to Donovan in front of Flodstrom.  However, the record reflects that when asked by both the Commonwealth and defense counsel whether Flodstrom handed over the money before or after Columbus found the pill bottle, Donovan stated that Flodstrom answered the questions and handed over the money prior to Columbus arriving with the pill bottle.  Thus, the judge's contrary finding is also clearly erroneous.  See Commonwealth v. Knowles, 451 Mass. 91, 93 n.2 (2008) (motion judge, without benefit of transcript, made several findings inconsistent with testimony of officer, which were deemed "clearly erroneous").[10]

_____

[9] See note 4, supra.  Also, in Flodstrom's motion to suppress, he claimed a violation of Commonwealth v. DiGiambattista, 442 Mass. 423, 441 (2004).  The motion judge noted that had Donovan recorded on a "smart phone" his conversation with Flodstrom, there would be a record regarding the completeness of the Miranda warnings.  As Flodstrom does not pursue the claim on appeal, we note that DiGiambattista applies only to a defendant's "statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention (e.g., a police station)."  Id. at 447.  As we conclude that the defendants were not in custody, and that a public restaurant parking lot would not likely qualify as a place of detention, DiGiambattista is not applicable here.

[10] Here, the motion judge's memorandum and order on the defendants' motions to suppress was dated April 21, 2015.  The

b.  Terry stop.  The motion judge erred in concluding that
the questioning of the two defendants during a Terry stop, see
Terry v. Ohio, 392 U.S. 1 (1968), amounted to custodial
interrogation.  Other than the order not to move, the motion
judge "points to no words or actions of the [detectives] that
could have transformed the nature of the encounter from informal
to aggressive" prior to the detectives' declarations that they
were placing the defendants under arrest.  Commonwealth v.
DePeiza, 449 Mass. 367, 376 (2007).  The detectives' questions
were not accusatory.  The detectives "did not imply that the
defendant[s were] suspected of a crime merely by asking"
Cawthron what he had just bought or Flodstrom what had just
occurred.  Ibid.  See Commonwealth v. Callahan, 401 Mass. 627,
630 (1988) ("Suspicion had not focused on the defendant, and the
questioning was neither aggressive nor overbearing").

The motion judge found that by the time the detectives each
questioned a defendant by the side of his car they were in
custody for purposes of Miranda because "[b]y this time any
reasonable person in the same situation would understand that
Donovan and Columbus were armed police officers who were
prepared to back up Donovan's commands with physical force, if
need be."  In support of this conclusion, the motion judge noted

court reporter's certificate on the transcript is dated April
10, 2015, making it likely that the judge did not have the
benefit of the transcript, which we understand is the norm.

that Donovan walked quickly toward the defendants, with his badge displayed, identifying himself as a police officer, and ordered the defendants to stay where they were. The motion judge also noted that Columbus arrived within one minute, that he also walked quickly towards the defendants, and that Flodstrom was ordered to go with Donovan and Cawthron ordered to go with Columbus. The judge found that Columbus conveyed to Cawthron that he was a suspect by asking him, "[W]hat did you just buy?" and that Donovan conveyed to Flodstrom that he was a suspect by giving him "some form of a Miranda warning" before questioning. However the motion judge's conclusion misapprehends "custody" jurisprudence.

In the Miranda case itself, 384 U.S. at 477-478, Chief Justice Earl Warren clarified that:

> "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."

See Commonwealth v. McNelly, 28 Mass. App. Ct. 985, 986 (1990). When the police approach individuals whom they have a reasonable suspicion to believe have committed a crime, any ensuing interview "will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement

system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply . . . because the questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). See Commonwealth v. Podlaski, 377 Mass. 339, 343 (1979) ("The fact that the officer would not let the defendant leave until he had talked to him did not make the interrogation custodial").

In this same manner, the motion judge erroneously concluded that the "interrogations [were] compelled under the implicit threat of force" because the detectives were "armed police officers who were prepared to back up Donovan's commands with physical force, if need be." This observation misses the mark as we must review what actually occurred, and not suppositions of what might have occurred. If our law was otherwise, every citizen encounter with the police would require Miranda warnings prior to an investigative inquiry. See Commonwealth v. Alcala, 54 Mass. App. Ct. 49, 54 (2002) (no custody where "[a]lthough some ten to fifteen local, State, and Federal police and other officers were in the general vicinity, and perhaps six or seven 'converge[d]' on the three men at the building, no more than two officers were with the defendant when he was interrogated").

In consideration of the four custody factors from Commonwealth v. Groome, 435 Mass. at 212, we conclude that what occurred here was an ordinary Terry stop, and it did not result in custodial interrogation prior to the defendants' formal arrests. See Commonwealth v. DePeiza, 449 Mass. at 375, citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984) ("Not every Terry-type investigative stop results in a custodial interrogation"). Here, the defendants were approached by two plain-clothed detectives, with badges displayed, who wished to inquire about the suspected drug transaction Donovan had witnessed. Each detective individually questioned one defendant, without the use of physical force to separate them, and without the use of handcuffs. The interviews were not conducted in an aggressive manner, but rather in a "regular tone," and the defendants were cooperative. Although the defendants were told to stay where they were, no guns were drawn and no voices were raised. The questioning was brief, and it occurred in a public parking lot. See Commonwealth v. McNelly, 28 Mass. App. Ct. at 986 (inquiry in public provided an "atmosphere which was far less intimidating than the police dominated atmosphere at issue in Miranda"). Also, the question, "[W]hat did you just buy?" was investigative and not accusatory. See Commonwealth v. Kirwan, 448 Mass. 304, 311 (2007) (general questioning of "a fact-finding nature, intended to verify or dispel a reasonable

suspicion of criminal activity," is investigative, not accusatorial). While the detectives suspected the defendants of having committed a crime, that suspicion was not expressly conveyed to the defendants prior to their arrests. To the extent Donovan informed Flodstrom of his Miranda rights, even partially, that did not implicitly convey an otherwise unannounced suspicion. If anything, it empowered Flodstrom to end the interview. Finally, even though the investigative inquiry ended in the defendants' arrests, the defendants had admitted they had committed a crime, the evidence of that crime was found in Cawthron's SUV, and the proceeds of the crime were on Flodstrom's person. See Commonwealth v. Lavendier, 79 Mass. App. Ct. 501, 505-506 (2011).

The defendants have failed to carry their burden of proof that they were in custody for purposes of Miranda. The motion judge erred by focusing on whether the defendants believed they were free to leave to the exclusion of the other Groome factors, which must be considered in determining whether Miranda warnings are required before questioning during a Terry stop. See Howes v. Fields, 565 U.S. 499, 509 (2012) ("Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of Miranda"). Compare Commonwealth v. Shine, 398 Mass. 641, 648

(1986) ("Questioning the defendant next to his friend's automobile where he had been sitting with his girlfriend, who remained there during the conversation, is far from the 'incommunicado interrogation . . . in a police-dominated atmosphere' which was the Supreme Court's concern in Miranda" [citation omitted]), with Commonwealth v. Gordon, 47 Mass. App. Ct. 825, 827 (1999) (Miranda warnings should have preceded police asking woman, who had been stopped from fleeing and was handcuffed in back of police cruiser, what she doing in area at early hour of morning).  The motions to suppress should have been denied.

Order allowing motions to
suppress reversed.