NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12322


COMMONWEALTH  vs.  KEITH CAWTHRON
(and three companion cases[1]).



Middlesex.     February 6, 2018. - May 23, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.


Controlled Substances.  Constitutional Law, Admissions and
    confessions, Investigatory stop.  Due Process of Law,
    Police custody.  Evidence, Admissions and confessions.
    Practice, Criminal, Motion to suppress, Admissions and
    confessions.



Indictments found and returned in the Superior Court
Department on April 24, 2014.

Pretrial motions to suppress evidence were heard by Kenneth
W. Salinger, J., and a motion for reconsideration was considered
by him.

An application for leave to prosecute an interlocutory
appeal was allowed by Botsford, J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
her to the Appeals Court.  After review by the Appeals Court,
the Supreme Judicial Court granted leave to obtain further
appellate review.

---

[1] One against Cawthron and two against Craig Flodstrom.

Timothy Ferriter, Assistant District Attorney, for the Commonwealth.
Lindsay Kanter, Committee for Public Counsel Services (Daniel E. Callahan, Committee for Public Counsel Services, also present) for Craig Flodstrom.
Thomas M. Glynn for Keith M. Cawthron.

GAZIANO, J.  In this case, we consider whether police officers were required to provide Miranda warnings prior to questioning two individuals who had been detained in a restaurant parking lot as part of a threshold inquiry into a street-level drug transaction.  A Middlesex County grand jury indicted the defendants, Keith Cawthron and Craig Flodstrom, on charges of trafficking in Oxycodone, in violation of G. L. c. 94C, § 32E (c) (1), and conspiracy to traffic Oxycodone, in violation of G. L. c. 94C, § 40.  The defendants filed motions to suppress statements made to detectives and pills found in one of the defendants' vehicles, arguing that they had been subject to custodial interrogation without adequate Miranda warnings, and the seizure of the pills was a result of custodial statements given absent such warnings.  A Superior Court judge concluded that the defendants had been subject to custodial interrogation without, in Cawthron's case, any warnings and, in

Flodstrom's case, an inadequate warning, and allowed the motions to suppress.[2]

The Commonwealth filed a timely notice of appeal.  A single justice of this court allowed the Commonwealth's application for leave to pursue an interlocutory appeal and reported the matter to the Appeals Court.  The Appeals Court issued an opinion reversing the judgment of the Superior Court.  See Commonwealth v. Cawthron, 90 Mass. App. Ct. 828 (2017).  We allowed the defendants' petitions for further appellate review.

Applying the factors set out in Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001), we conclude that the defendants were not subject to custodial interrogation.  Therefore, the Superior Court judge's decision allowing the motions to suppress must be reversed.

1.  Background.  We summarize the facts as found by the motion judge following an evidentiary hearing.  We indicate explicitly those few facts the judge found that are not supported by the record.

On April 12, 2013, Detective Michael Donovan of the Tewksbury police department stopped at a convenience store on

---

[2] The judge denied Flodstrom's motion to suppress statements that he made when officers first approached him, before they had asked any questions, but allowed the motion to suppress all statements made after the officers began asking questions.

Route 133 in Tewksbury.  Donovan was dressed in plain clothes and was driving an unmarked vehicle.  As he was walking across the parking lot toward the store, Donovan overheard a man, later identified as Cawthron, speaking on a cellular telephone outside the store.  Cawthron said that he was "going to pick them up now," and asked, "How many do you want" and, "Do you want ten?" Donovan suspected that Cawthron was arranging a narcotics transaction.  After purchasing a beverage in the store, Donovan returned to his vehicle and waited for Cawthron to leave the store.  Donovan then followed Cawthron's vehicle as it left the parking lot.

Cawthron traveled a short distance on Route 133, and then turned into the parking lot of a fast food restaurant.  After briefly losing sight of the defendant's vehicle, Donovan located it in a nearby steakhouse parking lot; Cawthron was standing outside his vehicle, speaking on his cellular telephone. Donovan parked his vehicle fifteen or twenty yards from Cawthron's.

Donovan contacted Detective Lieutenant Ryan Columbus of the Tewksbury police department and informed him of the investigation.  Columbus arrived, also in an unmarked vehicle, and established surveillance from a nearby parking lot.

Approximately five minutes later, a black vehicle entered the steakhouse parking lot and parked next to Cawthron's

vehicle. Flodstrom got out of this vehicle and approached Cawthron; the men shook hands and exchanged items that Donovan could not see. Based on these actions, the statement he had overheard in the convenience store parking lot, and his knowledge that the parking lots along Route 133 were often used for illegal drug transactions, Donovan believed this to be a hand-to-hand drug transaction.

Donovan got out of his unmarked vehicle, walked quickly to where the two men were standing, and identified himself as a police officer. He ordered the men not to move. At that point, Flodstrom said, "[T]his is how I feed my family." Columbus arrived at the scene shortly after Donovan had reached the defendants. He and Donovan decided to separate the two men and question them individually, before they had an opportunity to construct a shared response.[3] Donovan directed Flodstrom to the far side of Flodstrom's vehicle; Cawthron was directed to go with Columbus on the far side of Cawthron's vehicle. Each man moved approximately five yards from where he stood before the detectives arrived.

---

[3] At the hearing on the motion to suppress, both detectives testified that separating individuals for questioning is a standard police tactic, to reduce the possibility that the individuals would be able to coordinate their responses.

Once Donovan and Flodstrom were separated from Cawthron and Columbus, Donovan gave Flodstrom an oral Miranda warning.[4] Donovan then asked Flodstrom what had happened. Flodstrom responded that he had sold 300 Oxycodone pills to his uncle, Cawthron, for two dollars per pill. Flodstrom reiterated that this was how he fed his children, and pulled $600 from his pocket. After Flodstrom produced the money, Donovan placed him in handcuffs and told him that he was under arrest.

While this interaction was taking place, Columbus spoke with Cawthron in front of Cawthron's vehicle. Columbus identified himself as a police officer and asked Cawthron what he had purchased. Cawthron said that he had purchased pills for two dollars each. Columbus asked where the pills were, and Cawthron told him the pills were under the seat in his vehicle. Columbus looked under the driver's seat and found a full pill bottle. After retrieving the bottle, Columbus handcuffed Cawthron, placed him under arrest, and read him his Miranda rights. In response to the detective's further questions, Cawthron said that he was acting as the middle man for a friend.

---

[4] Rather than reading the warnings from a printed card, Donovan gave them to the best of his ability from memory. At the hearing on the motion to suppress, Donovan was unable to recall exactly what he told Flodstrom.

After handcuffing Cawthron, Columbus took the pill bottle to Donovan, who was standing with Flodstrom.[5]

Cawthron and Flodstrom were indicted by a Middlesex County grand jury on charges of trafficking in over eighteen grams of Oxycodone, G. L. c. 94C, § 32E (c) (1), and conspiracy to traffic in Oxycodone, G. L. c. 94C, § 40.

Cawthron and Flodstrom filed motions to suppress their statements and the evidence seized. After an evidentiary hearing, the judge found that the detectives had reasonable suspicion to stop the defendants and to conduct a threshold inquiry; that the defendants were subjected to custodial interrogation; and that the Commonwealth failed to prove that either Flodstrom or Cawthron received adequate Miranda warnings. Accordingly, the judge suppressed all of Cawthron's statements and the pill bottle found in his vehicle, and ordered Flodstrom's statements suppressed apart from his initial remark upon the first detective's arrival that "this is how I feed my family."[6]

---

[5] The judge found that Columbus showed Donovan and Flodstrom the pills before Flodstrom finished making his statements to Donovan. As discussed infra, this finding is not supported by the record.

[6] The judge also found that Flodstrom had automatic standing to challenge the search of Cawthron's vehicle, and thus suppressed the pills found in that vehicle with respect to the trafficking charge against Flodstrom, but not with respect to

The Commonwealth's motion to reconsider was denied.  The Commonwealth then filed an application in the county court for leave to pursue an interlocutory appeal.  A single justice of this court allowed the Commonwealth to pursue an interlocutory appeal in the Appeals Court.  After the Appeals Court reversed the allowance of the motions to suppress, see Cawthron, 90 Mass. App. Ct. at 839, we allowed the defendants' petitions for further appellate review.

The Commonwealth argues that the judge committed legal error when he determined that the defendants were subjected to custodial interrogation that necessitated Miranda warnings.  For the reasons that follow, we agree.

2.  Discussion.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'"  Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).

The encounter between the officers and the defendants began as a valid Terry-type stop, with an initial, brief inquiry into the suspicious transactions that a police officer believed he

_____

the conspiracy charge. The Commonwealth challenges the determination of automatic standing.  Because of the result we reach, we need not decide this issue.

had seen.  See Terry v. Ohio, 392 U.S. 1, 28-29 (1968).  Such stops are permissible where an officer has a reasonable suspicion that a crime has been, is being, or is about to be committed.  See id.  At that point, the interaction is casual, and generally no Miranda warnings are necessary.  See Commonwealth v. Borodine, 371 Mass. 1, 4 (1976).

At some point, however, the nature of the interaction may change, as officers begin to focus on a particular suspect. Miranda warnings seek to protect an individual's "fundamental" right under the Fifth Amendment to the United States Constitution that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  See Miranda v. Arizona, 384 U.S. 436, 468 (1966).  Miranda warnings require that police officers inform suspects of their "right[s] to remain silent, that any statement [they] do[] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed," before a custodial interrogation.  Id. at 444.  An interview is custodial where "a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive."  Commonwealth v. Larkin, 429 Mass. 426, 432 (1999).  Miranda warnings protect suspects from police-dominated environments that were "created for no purpose other than to subjugate the individual to the will of his examiner."  See

Miranda, supra at 457; id. at 474 ("Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement)."

Even where a suspect is temporarily seized, "[n]ot every Terry-type investigative stop results in a custodial interrogation." Commonwealth v. DePeiza, 449 Mass. 367, 375 (2007), citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984). See Miranda, 384 U.S. at 477 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding"); Commonwealth v. Kirwan, 448 Mass. 304, 312 (2007) (defendant was not in custody, despite not being free to leave, where "[the] interrogation was brief and in the nature of a preliminary investigation, and the defendant's detention was minimal"). "the fact that the defendant was not free to leave (at least until the performance of the field sobriety tests) did not render the interrogation custodial." Commonwealth v. Ayre, 31 Mass. App. Ct. 17, 20 (1991). "A person is in custody whenever [the person] is deprived of his [or her] freedom of action in any significant way" (quotation and citation omitted). Groome, 435 Mass. at 211. See Commonwealth v. Morse, 427 Mass. 117, 123 (1998), quoting United States v. Ventura, 85 F.3d 708, 712 (1st Cir. 1996) (custody is "a formal arrest or restraint on

freedom of movement of the degree associated with a formal arrest").  See generally Grasso & McEvoy, Suppression Matters under Massachusetts Law § 18-3[b] (2017).

To determine if a defendant was subjected to custodial interrogation, "the court considers several factors:  (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."  Commonwealth v. Groome, 435 Mass. at 211-212.  "Rarely is any single factor conclusive."  Commonwealth v. Bryant, 390 Mass. 729, 737 (1984).

Applying the Groome factors to the circumstances here, we conclude that the defendants have not met their burden of showing that they were in custody when they made the incriminating statements.  See Larkin, 429 Mass. at 432.

a.  Location of interviews.  To determine if the location of an interrogation contributed to a coercive environment, we consider the circumstances "from the point of view of the

defendant." See Commonwealth v. Conkey, 430 Mass. 139, 144 (1999), S.C., 443 Mass. 60 (2004) and 452 Mass. 1022 (2008). The detectives questioned the defendants in a public parking lot, during the day, and the defendants were neither handcuffed nor otherwise physically restrained. This environment is not police-dominated. See Vanhouton v. Commonwealth, 424 Mass. 327, 331-332 & n.7, cert. denied, 522 U.S. 834 (1997), quoting Pennsylvania v. Bruder, 488 U.S. 9, 11 n.3 (1988) (suspect stopped on suspicion of operating motor vehicle while under influence of alcohol and subject to field sobriety tests on side of road was not in custody, because, in part, "traffic stops commonly occur in the 'public view,' in an atmosphere far 'less "police dominated" than that surrounding the kinds of interrogation at issue in Miranda itself'"). Cf. United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) ("a public highway is a neutral setting that police officers are not in a position to dominate").

In this case, the detectives instructed the defendants to move approximately five yards from where they had been conversing in the restaurant parking lot, so that each detective would be able to speak with one of the defendants individually.[7]

---

[7] Flodstrom argues that the defendants' compliance with this instruction demonstrates that they did not believe they had any choice but to obey the detectives' orders. Even assuming that

This movement did not result in a coercive atmosphere.[8]  See Vanhouton, 424 Mass. at 331-332 (officer's instruction to driver to get out of vehicle and perform field sobriety tests did not create coercive atmosphere).

Other courts likewise have concluded that moving individuals a short distance, so as to interview them separately, does not constitute custodial interrogation.  In United States v. Campbell, 741 F.3d 251, 267 (1st Cir. 2013), for example, three individuals were traveling in a vehicle that was stopped by police.  Approximately five police officers "split up and questioned the defendants separately, such that each defendant was questioned by at most two officers."  Id.  The United States Court of Appeals for the First Circuit held that the officers' decision to separate the defendants, even where some were interrogated by multiple police officers, did not create an "overwhelming" environment that was custodial and

---

the movement was forced, however, does not necessarily result in a conclusion that the defendants were in custody for purposes of Miranda.  See Larkin, 429 Mass. at 432 (defendants have burden to establish that they were subject to custodial interrogation; restriction on freedom of movement does not necessarily amount to custody).

[8] Flodstrom also argues that his difficulty walking added to the coercive nature of the situation.  The judge did not make any findings about Flodstrom's physical condition, although Donovan testified that Flodstrom had a limp and appeared to have some difficulty moving.  No evidence in the record indicates that the short distance involved placed a significant burden on Flodstrom, such that his detention was custodial.

necessitated Miranda warnings. See id. We agree; the act of separating defendants briefly for individual questioning does not create an inherently coercive environment.

b. Whether the detectives conveyed a belief that the defendants were suspects. If the detectives had conveyed to the defendants that they were suspects, that might support a determination that the defendants were in custody before they made the incriminating statements. See Commonwealth v. Simon, 456 Mass. 280, 287-288, cert. denied, 562 U.S. 874 (2010). When they approached the defendants, one of the detectives asked one of the defendants what he had just purchased, a question the defendants maintain indicates that the detectives believed the defendants had been involved in a public drug transaction. We do not agree. The interview occurred as part of the detectives' "brief, preliminary effort to confirm or dispel a suspicion" that the defendants had purchased and sold drugs. See Kirwan, 448 Mass. at 311.

We conclude that, in their initial questioning, the detectives did not convey a suggestion that the defendants were suspects; the question could have referred to many types of innocent activities. At most, it was a vague and unformed suspicion of some illicit activity. In Commonwealth v. Callahan, 401 Mass. 627, 630 (1988), officers also asked a defendant "what happened," after they discovered him near a dead

body; the court concluded that he was not in custody, albeit that he was not free to leave. In Commonwealth v. Shine, 398 Mass. 641, 648-649 (1986), the court concluded that a defendant was not in custody when he made a statement to police, notwithstanding the interrogating officer's uncommunicated intent to arrest the defendant, where the officer asked only "natural preliminary questions designed to determine the defendant's identity and what he knew about the crime." In Simon, 456 Mass at 287, the court determined that a defendant was in custody because, inter alia, police officers began a conversation with the defendant by informing him that he was suspected of shooting the victim. In this case, by contrast, the evidence does not clearly establish that the detectives told the defendants they were suspected of a crime.

Although Columbus apparently suspected that Cawthron had purchased drugs, based on the conversation that Donovan overheard in the convenience store parking lot, this "unarticulated suspicion[] contribute[d] nothing to the objective circumstances of the encounter." See Groome, 435 Mass. at 212 n.13; Commonwealth v. Gendraw, 55 Mass. App. Ct. 677, 683 (2002) ("although the officers may have believed that the defendant was a suspect . . . the detectives did not convey any such belief to the defendant"). Columbus's question to Cawthron, "What did you just buy?" may suggest the topic of his

preliminary investigation.  In determining whether a suspect was in custody at the time a statement was made, however, police officers' questions are relevant if they "affected how a reasonable person in that position would perceive his or her freedom to leave."  See Stansbury v. California, 511 U.S. 318, 325 (1994).  Columbus's question would not cause a reasonable person to feel that his freedom to leave had been curtailed to the degree associated with formal arrest.

The judge found that a reasonable person in Flodstrom's situation would have believed that police suspected him of a crime, in part, because Columbus brought over the bottle of pills to show Donovan, in Flodstrom's line of sight, before, or during, Donovan's questioning of Flodstrom.  This factual finding is unsupported by the evidence introduced at the hearing, and, therefore, we decline to defer to it.[9]

---

[9] At the end of his cross-examination of Donovan, Cawthron's counsel asked Donovan if Columbus brought the pills over after Flodstrom had told Donovan about the exchange.  Donovan first replied, "Yes, I believe so;" when asked if he was sure, Donovan said, "Yes.  [Flodstrom] had stated that he had sold [Cawthron] pills and handed me money."  When pressed about the timing, Donovan responded, "I don't remember exactly when it happened, no."  On redirect examination, the prosecutor again pursued this line of inquiry, asking, "[Y]ou were just asked if [Columbus] had either informed you that he had recovered the bottle of pills, or he had shown that to you.  And just so I'm clear, was that before or after [] Flodstrom had produced the six hundred dollars to you?"  Donovan responded, "After."

In response to multiple questions from both defense counsel and the Commonwealth, Donovan testified that Columbus showed him the pill bottle after Flodstrom had answered his questions and produced the money from his pocket. Donovan did give one equivocal response on cross-examination, but never stated that he was shown the pill bottle before or while Flodstrom was answering his initial questions or producing the money from his pocket. No other evidence was introduced about the timing. While a motion judge may decline to credit a witness's testimony, the judge may not make "findings that [are] inconsistent with the uncontradicted testimony of the" witness, where "there was no evidence to support those findings." Commonwealth v. Knowles, 451 Mass. 91, 93 n.2 (2008).

In concluding that Flodstrom was in custody, the judge also relied in part on Donovan's decision to provide Flodstrom with some form of Miranda warning. "[T]he reading of the Miranda rights does not automatically demonstrate seizure." Commonwealth v. Martinez, 458 Mass. 684, 695 (2011). This court has encouraged police officers to give Miranda warnings before "the exact moment when the warnings are constitutionally required." See Commonwealth v. Raymond, 424 Mass. 382, 393 n.9 (1997), S.C., 450 Mass. 729 (2008). We reiterate that a decision to give the warnings does not indicate that a defendant is, in fact, in custody.

c.  Tone of interviews.  On the third Groome factor, the
judge found that the conversations between the defendants and
the detectives "were not relaxed or conversational."  Even so,
nothing in the record suggests that they were "aggressive,"
"persistent," or "harsh," which would support a conclusion that
the defendants had been subject to a custodial interrogation.
See Commonwealth v. Coleman, 49 Mass. App. Ct. 150, 155 (2000).
The uncontroverted testimony from the detectives was that the
interactions with the defendants occurred in a "regular tone"
and were "very cooperative."

In concluding that the defendants were in custody, the
judge relied in part on the fact that "the officers asked
questions, making clear that they expected to receive prompt
answers, and the [d]efendants responded to each inquiry.
Neither defendant was ever told that they were free to walk
away, that they could terminate their interrogation whenever
they wished . . . or anything else to offset the inherently
coercive nature of the situation."

Having concluded that the location of the interrogations
was not coercive, we do not view the other facts identified by
the judge, that the detectives wore "police badge[s]," and "were
armed," as creating an inherently coercive environment.  The
detectives did not display their weapons.  In the absence of
evidence beyond the detectives' subjective suspicions that the

defendants had committed a crime, which are irrelevant for these purposes, we conclude that the tone "was neither aggressive nor confrontational," and that questioning was appropriate fact finding to confirm or dispel the detectives' belief that they had observed a drug transaction.  See Commonwealth v. Hilton, 443 Mass. 597, 610 (2005), S.C., 450 Mass. 173 (2007).  Contrast Coleman, 49 Mass. App. Ct. at 155 (interrogation was "aggressive and persistent" where "defendant's denials were scorned and overridden," "substance of what was said was harsh and intended by the questioner to be so").

d.  Whether the defendants were free to leave.  We turn to the final Groome factor, whether the defendants were free to end the interview by asking to terminate the interview or, simply, by leaving.  The detectives testified that the defendants were not free to leave, and that they would have prevented the defendants from leaving if they had tried.  Further, the defendants were arrested at the end of the interrogations, after each provided statements and physical evidence of a drug transaction.

While this factor weighs in favor of a conclusion that the defendants were in custody, that conclusion does not necessarily follow.  An "arrest after an incriminating statement has been obtained, by itself, [does not] label[] as custodial the interrogation that precedes the incriminating statement"

(citation omitted). Bryant, 390 Mass. at 742 n.15. Cf. Commonwealth v. Lawrence, 404 Mass. 378, 386-387 (1989) (declining to suppress statements made to officer during search of home, because defendant was not in custody at time of making statements, but, rather, was arrested after police found evidence during search). "Not all restraints on freedom of movement amount to custody for purposes of Miranda." Howes v. Fields, 565 U.S. 499, 509 (2012). "Determining whether an individual's freedom of movement was curtailed . . . is simply the first step in the analysis." Id. We balance the fact that the defendants were not free to leave the interview, and were arrested at its conclusion, against the other Groome factors. A single factor rarely is determinative. See Bryant, 390 Mass. at 737. The United States Supreme Court has acknowledged that "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so," but nonetheless has concluded that traffic stops are not custodial and Miranda warnings are not required in those circumstances. See Berkemer, 468 U.S. at 436.

In reaching a contrary conclusion, the judge relied on Simon, 456 Mass. at 287, and our previous statement that "[t]he critical question in determining whether an individual is in custody is whether a reasonable person in the individual's position would feel free to leave." Id., citing Commonwealth v.

Damiano, 422 Mass. 10, 13 (1996). While this may be a critical factor, today we clarify that it cannot be the determinative factor. Custody is "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," see Morse, 427 Mass. at 123; inability to leave may support a finding of custody, but a Terry-type stop, without more, is not custodial. See Howes, 565 U.S. at 509. See also Berkemer, 468 U.S. at 436.

This case is unlike Simon, 456 Mass. at 287. There, officers began their conversation with the defendant by telling him that he had been identified as the person who shot the victim. Id. at 283. Although the conversation took place at the defendant's attorney's office, the defendant was aware that six or seven police officers had arrived and were waiting outside for him. Id. at 287. In those circumstances, the defendant's freedom of movement was curtailed to a degree associated with formal arrest, because he was not free to leave a building that he knew to be surrounded by police officers, and because he was informed that he was a suspect. See id. at 283, 287. Those factors are absent from this case. Here, the defendants were not told that they were suspected of a crime, and the discussions were held one-on-one, in an open, public space, rather than inside a building surrounded by other officers.

The circumstances here are similar to those in Kirwan, 448 Mass. at 312, where we affirmed a Superior Court judge's determination that a defendant was not in custody, despite the judge's determination that the defendant was not free to leave his home, where he was speaking with an officer.  In that case, the "interrogation was brief and in the nature of a preliminary investigation, and the defendant's detention was minimal."  Id. The defendants in this case likewise were subject to a minimal detention when officers asked them to move a few yards; the detectives conducted a very preliminary investigation, by asking what happened and what one defendant had purchased.  Each defendant, at that preliminary stage of the investigation, then offered the incriminating statements about purchasing and selling pills that resulted in their arrests.

Because we conclude that the environment was noncoercive, as in Kirwan, the fact that the defendants were not free to leave does not transform the stops into custodial interrogations, where the other Groome factors weigh against custody.  See Vanhouton, 424 Mass. at 332 (defendant suspected of drunk driving and subjected to field sobriety tests not in custody, despite not being free to leave); Callahan, 401 Mass. at 630 (defendant was not in custody, despite officers asking him "what happened" and him not being free to leave after officers discovered dead body); Bryant, 390 Mass. at 738-740

(defendant admitted to shooting victim and was likely not free to leave his home where he was speaking with police officers, but was not in custody immediately following confession when police officer asked him if he had anything more to say).

In DePeiza, 449 Mass. at 375 & n.5, this court found that a Terry-type stop was noncustodial, even though the officers had seized the defendant for a frisk and the officers then asked him, "Do you have a gun or do you have a firearm?"  In holding that the environment was not police-dominated, the court concluded that the officers' question did not convey that they suspected the defendant of a crime, the tone of the interview was conversational, and at no point did the encounter become aggressive.  Id. at 376.  Here, too, the interviews were conversational, the interaction was not aggressive, and Columbus's question, "What did you just buy?" did not convey to Cawthron that he was suspected of a crime.  We conclude that, absent additional factors, the defendants were not in custody when they made their statements to police.

3.  Conclusion.  The order allowing the defendants' motions to suppress is reversed.  The matter is remanded to the Superior Court for further proceedings.

So ordered.